# IN THE COURT OF APPEALS OF TENNESSEE,
## AT JACKSON

_____

| | | |
|---|---|---|
| **DAVID GROSS**, | ) | Shelby County Chancery Court |
| | ) | No. 109718-2 R.D. |
| Petitioner/Appellee, | ) | |
| | ) | C.A. No. W1998-00548-COA-R3-CV |
| VS. | ) | |
| | ) | |
| **SHERIFF A. C. GILLESS, JR., AND** | ) | **FILED** |
| **THE SHELBY COUNTY SHERIFF'S** | ) | |
| **DEPARTMENT, AND SHELBY** | ) | |
| **COUNTY GOVERNMENT**, | ) | **December 15, 1999** |
| | ) | |
| Respondents/Appellants. | ) | **Cecil Crowson, Jr.** |
| | ) | **Appellate Court Clerk** |

_____

From the Chancery Court of Shelby County at Memphis.
**Honorable Floyd Peete, Chancellor**

**Alan G. Crone**, CRONE & MASON, P.L.C., Memphis, Tennessee
Attorney for Respondents/Appellants.

**Alan Bryant Chambers**, CHAMBERS & DURHAM, Memphis, Tennessee
Attorney for Petitioner/Appellee.

OPINION FILED:

**REVERSED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**HIGHERS, J.**: (Concurs)

Defendants Sheriff A.C. Gilless, Jr., the Shelby County Sheriff's Department, and Shelby County Government appeal the trial court's judgment granting the petition for writ of *certiorari* filed by Plaintiff/Appellee David Gross and reversing the decision of the Shelby County Civil Service Merit Board to terminate Gross from his employment with the Sheriff's Department. We reverse the trial court's judgment and reinstate the decision of the Civil Service Merit Board.

On December 11, 1996, Deputy David Gross was working as a transport officer with the Fugitive Division of the Shelby County Sheriff's Department. That evening, officers of the Fugitive Division arrived at the Ebony and Lace Club for the purpose of serving an arrest warrant on the club manager or owner. The officers apparently did not succeed in arresting their subject, but they did arrest a female employee of the club for whom they discovered an outstanding arrest warrant.

As the transport officer, Gross's primary duty was to transport any arrested persons downtown for processing. If needed, Gross's duties also included assisting the other officers in effecting an arrest or in securing the premises once an arrest was made. When Gross arrived at the Ebony and Lace Club, he entered the building to see what the other officers were doing. Inside the club, he found his father, Deputy Eddie Gross, along with Eddie Gross's partner, Deputy Kelly Gore, and the ranking officer on the scene, Sergeant P.J. Kirwan. At the time, Eddie Gross was using a telephone to check for outstanding warrants on the club employees present.

Before leaving the building with the arrested club employee, the officers discussed what actions were necessary to "secure" the premises. The officers' primary concern was that, unless a club employee agreed to assume responsibility for the operation of the club, the Sheriff's Department might be blamed for any theft or vandalism that occurred after their departure. Although a club employee apparently had unlocked the building and permitted the officers to enter, none of the club employees present would admit to possessing a key to the building or to being in charge of the premises. Ultimately, the officers were able to reach someone by telephone who agreed to assume responsibility for the club's operation that evening.

When Sergeant P.J. Kirwan left the scene, the building was secure "[a]s far as [he] was concerned" because Deputies Eddie Gross and Kelly Gore remained on the scene and because a responsible party was expected to arrive soon. As he was leaving the scene, Kirwan observed David Gross checking the building to make "sure that all the doors were secured." When he left, Kirwan did not think that anyone needed to reenter the building to check the doors, and he did not order anyone to do so. Apparently, however, any one of the remaining officers had the discretion to take this action "according to his own judgment."

After Sergeant Kirwan left, only David Gross, Eddie Gross, and Kelly Gore remained on the scene. By this time, Deputies Gore and Eddie Gross had escorted the arrested employee outside to their patrol car. Like Sergeant Kirwan, Deputy Gore had no intention of reentering the club after he exited the building. He and Eddie Gross spent about ten minutes asking the arrested employee questions and writing an arrest ticket.

When Gore and Eddie Gross had almost completed this task, Deputy David Gross decided to reenter the club. David Gross first offered "to wait around and see if somebody can come lock [the club] up." Eddie Gross responded negatively to this offer, indicating that there was "no need in hanging around" and suggesting that David Gross instead transport the arrested employee downtown. David Gross then indicated that he would just tell the club employees that the officers were leaving, and he proceeded to reenter the club.

At some point after reentering the building, Gross acquired a beverage that appeared to be coffee or a soft drink. He then asked a club dancer to show him the back door to the building. Gross remembered the dancer from earlier in the evening because she had worn only a shirt in the officers' presence. After Gross checked the back door, he followed the dancer into the club dressing area. There, the dancer proceeded to disrobe while Gross watched her with the drink still in his hand. After the dancer had completely disrobed, a period of one to two minutes, Gross turned and exited the room and the building. Gross then transported the arrested employee downtown.

Gross's encounter with the dancer in the club dressing area was recorded by the club's surveillance camera. A videotape of the event was provided to a local television station, which

broadcast the tape on its evening news program. Embarrassed by the incident, officials at the Sheriff's Department decided to discipline Gross for conduct unbecoming an officer and other departmental rules violations. An administrative hearing board found Gross guilty of engaging in unbecoming conduct and failing to report the incident; however, it found Gross not guilty of violating the Department's rule requiring "truthfulness." The board recommended that Gross receive a thirty-day suspension without pay.

Rejecting the administrative hearing board's recommendation, Deputy Chief Don Wright decided to terminate Gross's employment with the Department "based on his unbecoming conduct." Gross appealed his termination to the Shelby County Civil Service Merit Board. At the evidentiary hearing conducted before the Civil Service Merit Board, both parties elected not to introduce the videotape depicting Gross's conduct. During the hearing, Chief Wright explained why he decided to terminate Gross rather than to suspend him as recommended by the administrative hearing board:

> [Gross's] responsibility that night was to drive the transport car and bring the individuals that had been arrested to jail.
>
> As he returned back into the club, he follows this individual into the room and stands there with a drink in his hand observing her taking her clothes off and this behavior is being captured on television, and then in turn this behavior is shown on local television and all the citizens of Memphis and Shelby County are sitting and watching one of our deputies watch a dancer disrobe herself while he's standing drinking a drink, a Coke, a coffee or whatever is in that drink, is standing there watching her. In my opinion this type of behavior undermines our credibility and undermines our reputation in the community, and it calls for us as a Department to have to take this action that we took because, in my opinion, if we don't police ourselves we can't police society, we can't police this community.
>
> I took the action I took based on – I realize this incident was an embarrassment to the officer. It was an embarrassment to his family. It was an embarrassment to law enforcement in general. It was an embarrassment to the sheriff's office. It was an embarrassment to his fellow officers. I felt it was – the behavior needed to be dealt with and that we had to send a statement to the taxpayers that we were willing to police ourselves before we come out to police [them].

Wright later explained that

>[w]ell, this situation occurred in that [Gross] was back in the club by himself after the other units had already cleared the scene. They were already out of the building, their work in that building was over. It was done, finished. All of the officers should have been out in the parking lot.
>
>[Gross] took it upon himself to go back in the club on his own without being instructed to do so, and he took it upon himself after he got back in the club at sometime to get a drink from somewhere and start drinking it and he's on duty there to perform a police service, and then he took it upon himself to follow this woman into this room and stand there and watch her while she disrobed. All of this together, to me, is just behavior that the Sheriff's Department can't tolerate.

Wright acknowledged that the negative publicity surrounding the event influenced his decision to terminate Gross. Wright explained that

>[t]here's publicity in everything we do. We're a public office and we're public officials. Everything we do, publicity enters into it. Public image enters into it. That's the reason we're here.

At the hearing, David Gross defended his decision to reenter the club, explaining that he "went inside to get the club secured." Gross testified that

>[t]he reason I went back in, I was talking with the other officers and I let them know that, you know, because they had been talking earlier, before I got there, about the security of the club or whatever they were going to do because it was – I don't remember any males being there. Once I left there were males there to secure the club or help the ladies.
>
>. . . .
>
>. . . There were two guys that said they were security guards. When they were there we didn't worry about it any more. They said they could take care of it.

Gross later explained that

>Well, Sergeant Kirwan, we had talked about it before he left and when we were all leaving the club. Then he left and while we were there I went back in to let them, you know, let them know they have to do the best they can.
>
>The ladies, the three ladies that were left there, were talking

about they wanted to close, they didn't want to stay there by theirselves.

. . . .

. . . When I was leaving, completely leaving the club, the two guys had came in and they said they were security for the place.

Gross also defended his decision to remain in the dressing area while the dancer disrobed:

She went in her locker and I didn't know what was in her locker. The premises, we didn't search the premises for any weapons or anything like that so I kept a close eye on her after she went in her locker.

. . . .

. . . [S]he went in her locker and I didn't know what she had got out of her locker so I wanted to make sure I kept a close eye on her.

Gross's supervisor, Sergeant Will McElhaney, testified that Gross was a "good and efficient officer," and he defended Gross's decisions to reenter the building to secure the premises and to continue observing Collins as a safety precaution due to her "suspicious" behavior of disrobing in front of Gross. Nevertheless, McElhaney agreed that, as a general proposition, it was inappropriate "for a Sheriff's deputy in uniform, a badge on his uniform and a gun on his hip, a drink in his hand, to watch a lady disrobe, by himself, alone in a room with her."

At the hearing's conclusion, the Civil Service Merit Board upheld Gross's termination based upon its finding that Gross was "guilty of Violation of Rules and Unbecoming Conduct." Gross then filed a petition for writ of **certiorari** in the trial court. After conducting a hearing at which it considered the arguments of counsel for both parties, and after reviewing the administrative record, the trial court entered a judgment granting Gross's petition and reversing the Board's decision to terminate Gross. In its judgment, the trial court explained its reasons for reversing the Board's decision:

This Court shall not substitute its judgment for the judgment of the Shelby County Civil Service Merit Board. However, this Court

finds that recommendation of the Administrative Hearing Board to be more consistent with the findings in the record. Chief Deputy Donald W. Wright overruled the findings and recommendation of the Administrative Hearing Board without a review of the videotape depicting Officer Gross' behavior and this Court finds such action arbitrary. This Court is further of the opinion that Deputy Wright's actions were politically motivated and an attempt to lessen some of the criticism of the Shelby County Sheriff's Department by the media. This Court finds the ruling of the Civil Service Merit Board consistent with the decision of Deputy Wright also to be arbitrary. This Court is of the opinion that a suspension for a period of thirty (30) days to six (6) months, would be more consistent with the original Board's ruling and recommendation.

On appeal, the Defendants contend that the trial court erred in reversing the decision of the Shelby County Civil Service Merit Board. In reviewing the decision of the Civil Service Merit Board under the common-law writ of *certiorari*, the trial court may reverse or modify the Board's action only if the court concludes that the Board "has acted in violation of constitutional or statutory provisions or in excess of its own statutory authority; has followed unlawful procedure or been guilty of arbitrary or capricious action; or has acted without material evidence to support its decision." *Watts v. Civil Serv. Bd.*, 606 S.W.2d 274, 277 (Tenn. 1980), *cert. denied*, 450 U.S. 983 (1981). On appeal, this court's scope of review is the same; it "is no broader or more comprehensive than that of the trial court with respect to evidence presented before the Board." *Id*.

After reviewing the transcript of the Board hearing, we conclude that the Board's decision to terminate Gross was supported by material evidence. This evidence indicated that Gross's primary duty was to transport prisoners. Although witnesses agreed that Gross's duties also included assisting the arresting officers and helping to secure the premises, the evidence suggested that such assistance was not needed in this case. Significantly, more experienced officers on the scene had determined that taking any further action to secure the premises was unnecessary. Sergeant Kirwan, the ranking officer on the scene, testified that he did not think anyone needed to reenter the building to check the doors and that he did not order anyone to do so. One of the arresting officers, Deputy Kelly Gore, testified that, once he and his partner escorted the arrested woman outside to their car, Gore had no intention of reentering the building. Gore also testified that, when Gross offered "to wait around and see if somebody can come lock [the club] up," Gross was discouraged from taking this action by Deputy Eddie Gross, Gore's partner and Gross's father. When Eddie Gross suggested that David Gross instead transport the prisoner downtown, David

Gross disregarded this advice and reentered the building. Deputy Gore testified that, prior to reentering the building, Gross explained that he merely planned to tell the club employees that the officers were leaving. At the hearing, however, Gross explained that he "went inside to get the club secured."

Based on the foregoing evidence, we conclude that the Board justifiably could have questioned David Gross's motive for reentering the building. More importantly, however, we conclude that the Board would have been justified in rejecting Gross's explanation for his conduct after he entered the building. Gross admitted that he followed the club dancer to the rear of the club and into the club dressing area where he watched the dancer completely disrobe over a one to two minute period while conversing with the dancer. Gross did not deny that, at some point after entering the club, he obtained a beverage that he occasionally drank while he watched the dancer undress. Although Gross insisted that he continued to observe the woman only because he was not sure what items or weapons she might have removed from her locker, he failed to explain why, if he was concerned for his safety, he was holding a drink during the encounter. In fact, Gross did not explain how he acquired the drink or how the drink accorded with his plan to secure the premises. Gross's supervisor attempted to defend Gross's conduct, but even he acknowledged that it appeared inappropriate.

As previously indicated, in reversing the Board's decision to uphold Gross's termination, the trial court ruled that Chief Wright acted arbitrarily in terminating Gross because Wright failed to view the videotape depicting Gross's behavior and because Wright's actions were "politically motivated and an attempt to lessen some of the criticism of the Shelby County Sheriff's Department by the media." In support of these rulings, the trial court noted that, during the hearing before the Board, Chief Wright admitted (1) that he did not view the tape of the incident and (2) "that public image was the reason for these parties being before the board and that publicity figures into everything that the Sheriff's department does." We conclude that both of these rulings were in error, the first because it was not supported by the evidence and the second because it was not supported by the law.

We initially observe that the trial court's finding that Chief Wright did not view the

tape of the incident appears to be based upon a misreading of the record. At one point in his testimony, Chief Wright indicated that he "did not view the tape." A closer reading of this portion of the transcript, however, reveals that Chief Wright was referring to the day the tape first was delivered to the Sheriff's office. When asked if he was present when the tape was delivered, Wright gave the following response: "I was on the ninth floor. I was not in [Sheriff Gilless's] office. I did not view the tape."

Chief Wright's subsequent testimony, however, reveals that he did view a tape of the incident in question. During his cross-examination, Wright was asked to describe the information upon which he based the decision to terminate Gross:

> Q.      So how did you know enough information to decide that [Gross] was guilty of unbecoming conduct?
>
> A.      I have access to the I.A.B. [Internal Affairs Bureau] investigation. I have access to [Gross's] own statement.
>
> Q.      You had his statement in the I.A.B. investigation?
>
> A.      *And I had a tape to look at*.
>
> Q.      Did you in fact look at a tape of the [administrative] hearing?
>
> A.      No, *a tape of the incident in question*.

Thus, the record does not support the trial court's finding that Chief Wright failed to view the videotape.

As for the trial court's finding that Chief Wright was improperly influenced by the negative publicity surrounding this case, we reject the suggestion that, in making the decision to terminate Gross, Wright was not permitted to consider such publicity. Apparently, neither the record on appeal nor the Shelby County Civil Service Merit Act[1] contains a definition of the term "unbecoming conduct." The definitions used by other jurisdictions, however, suggest that publicity and public perception may be relevant to the issue of whether challenged conduct is "unbecoming." In Ohio, for example, the regulations of the Franklin County Sheriff's Department defined

---

[1] 1971 Tenn. Priv. Acts 110.

unbecoming conduct as "that which brings the department into disrepute or reflects discredit upon the individual as a member of the department, or that which impairs the operation or efficiency of the department or the individual." *Jones v. Franklin County Sheriff*, 555 N.E.2d 940, 944 (Ohio 1990). In Pennsylvania, the term unbecoming conduct has been defined by case law as "any conduct adversely affecting the morale or efficiency of the bureau or department to which [the officer] is assigned or conduct which has a tendency to destroy public respect for municipal employes [sic] or confidence in the operation of municipal services." *Leroi v. Civil Serv. Comm'n*, 382 A.2d 1260, 1261 n.2 (Pa. Commw. Ct. 1978).

The proposition that publicity may be relevant to the question of what constitutes unbecoming conduct is further supported by the court's decision in *Hatfield v. Civil Service Commission*, 495 P.2d 1146 (Colo. Ct. App. 1972). In that case, the plaintiff, a wildlife conservation officer, was disciplined for conduct unbecoming an officer after he discharged his firearm while retrieving a goose from an area closed to hunting. On appeal from the Civil Service Commission's decision upholding his suspension, the plaintiff argued that the Commission erroneously concluded that he violated state law by hunting in the closed area. In support of this argument, the plaintiff pointed to uncontroverted evidence in the record which showed that he had wounded the goose outside the closed area and that he merely had entered the closed area to retrieve the goose.

The appellate court rejected the plaintiff's argument and held that, regardless of whether the plaintiff had violated the law, he still could be found guilty of conduct unbecoming an officer. The court explained that

> the findings of the Commission make it clear that the plaintiff was not disciplined for violating the law, but for conduct unbecoming a Wildlife Conservation Officer. The Commission concluded that by carrying a firearm into the restricted area, discharging it, and then exiting the area with geese, the plaintiff created the impression with onlookers that he had violated the very restrictions he was responsible for enforcing. This was found by the Commission to be an example of extremely poor judgment which reflected public discredit and censure upon the plaintiff, the Division of Game, Fish and Parks, and the State of Colorado, all of which justified the suspension imposed.

*Hatfield*, 495 P.2d at 1147-48.  As for the negative publicity that followed the event, the court

observed that

> the Commission's findings, supported by the evidence, show that the plaintiff's poor judgment caused the incident which was well publicized and subjected the Division of Game, Fish and Parks to adverse publicity detrimental to the public interest.

*Id*. at 1148.

In the present case, the record contains material evidence that, by his poor judgment, Gross caused an incident that was well publicized and that subjected the Sheriff's Department to adverse publicity detrimental to the public interest.  If anything, the fact that Gross's actions resulted in negative publicity supports, rather than contradicts, the Board's finding that Gross engaged in unbecoming conduct.  Accordingly, we conclude that the trial court erred in reversing the Board's decision based upon this reason.

We note that, in reversing the Board's decision, the trial court seemed primarily concerned with the Board's decision to terminate Gross rather than to impose a less severe punishment, such as the thirty-day suspension recommended by the administrative hearing board.  In its judgment, the trial court apparently agreed that Gross should be disciplined because it recommended that Gross receive a suspension ranging from thirty days to six months.

We acknowledge that the Board's decision to terminate Gross rather than to impose a lesser degree of discipline may appear harsh; however, having concluded that material evidence supports the Board's finding that Gross engaged in unbecoming conduct, we are not in a position to second-guess the disciplinary action chosen by the Board.  We note that the record contains no evidence to suggest that the Board lacked authority to impose this punishment or that the Board treated Gross any differently that it has treated other officers found to have engaged in unbecoming conduct.

The trial court's judgment is reversed, and this cause is remanded for further

proceedings consistent with this opinion. Costs of this appeal are taxed to David Gross, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S.

_____
HIGHERS, J.