# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
January 23, 2003 Session

## MICHAEL HIGGINS v. SHERIFF A. C. GILLESS, JR.

**A Direct Appeal from the Chancery Court for Shelby County**
**No. 109954-3     The Honorable D. J. Alissandratos, Chancellor**

---

**No. W2001-02829-COA-R3-CV - Filed February 19, 2003**

---

Petitioner, off-duty deputy sheriff, was arrested during bust of known drug house for possession of drug paraphernalia.  Upon deputy sheriff's arrest, Internal Affairs twice ordered petitioner to submit to drug test.  At time of requests, petitioner did not have assistance of counsel; however, two Sheriff's Association representatives were present and available for consultation. Petitioner refused both orders, but on third day following arrest, after consulting with an attorney, voluntarily requested drug test.  Department refused request, and subsequently charged petitioner with insubordination, possession and use of illegal drugs, and conduct unbecoming an officer. After hearing before the Deputy Chief, petitioner was terminated.  Civil Service Merit Board upheld termination, and petitioner filed common law writ of certiorari with chancery court.  Chancery court affirmed the Civil Service Merit Board.  We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and HOLLY KIRBY LILLARD, J., joined.

Kevin Bernstein, Memphis; Alan Bryant Chambers, Memphis for Appellant, Michael Higgins

Alan G. Crone, James J. Webb, Jr., Memphis, For Appellee, Sheriff A. C. Gilless, Jr.

## OPINION

On February 25, 1997, three officers from the Memphis Police Department conducted a buy-bust operation[1] at a rooming house on East Olive Street in Memphis, Tennessee.  The rooming house was a known center for drug activity.  During the operation, the officers detained several subjects in the hallway of the house.  According to Officer Caesar R. Polk ("Officer Polk"), at some point

---

[1] Officer Caesar R. Polk testified that a buy-bust operation is an "operation where undercover officers make drug buys from a crack dealer or marijuana dealers while undercover."  Once an exchange of money (usually marked) and drugs has taken place, and the dealer has been identified, the exchanging officer gives a "takedown signal" and the remaining undercover officers enter the scene to make arrests.

during the bust, while officers were detaining the subjects, a door was bumped open. Inside the opened room the officers found petitioner, Deputy Michael Higgins ("Higgins"), in possession of illegal narcotics and drug paraphernalia. [2]

According to Officer Polk, he viewed petitioner through the open door, sitting in a chair holding a glass straightshooter crack pipe. As the first officer into the room, Officer Polk witnessed Higgins stand up and drop the pipe at his feet. Officer Polk further observed a gun, later identified as petitioner's service revolver, lying on the floor a short distance from where the crack pipe landed, and discovered two rocks of crack cocaine and "crack residue" on a coffee table less than a foot away from where Higgins was sitting. Officer Polk and Officer Wiley Taylor ("Officer Taylor"), who also participated in the bust, both asserted that Higgins told them that he had just finished smoking a rock of cocaine. At the time of his arrest, Higgins was dressed in a white t-shirt and his green uniform pants.

Petitioner Higgins is a 23-year veteran of the Shelby County Sheriff's Department. At the time of his arrest, Higgins was employed as a deputy sheriff with the department. Higgins was not on duty on February 25, because he had called in sick. Higgins explains that he was present at the East Olive Street rooming house because he was looking for a friend to work on his car. When he couldn't locate his friend, Higgins noted that a woman named Brenda Cook ("Cook"), the alleged tenant/occupier of the room in which Higgins was discovered, offered to call petitioner's friend, and allowed him to wait around until his friend showed.[3] As he was waiting, Higgins testified that he consumed a substantial amount of alcohol.

Based on petitioner's statement and the physical evidence gathered at the scene, Higgins was placed under arrest and escorted to the Shelby County Jail. The evidence in the record is undisputed that, at the time of his arrest, Higgins was cooperative and under control.[4] When he arrived at the Shelby County Jail, Higgins was met by Lieutenant William J. Howard ("Lieutenant Howard"). Lieutenant Howard, as instructed by Inspector Jimmy P. Tucker ("Inspector Tucker") of the Shelby County Sheriff's Office, Internal Affairs Division, proceeded to relieve petitioner of duty. Higgins was subsequently charged with possession of drug paraphernalia and possession of a controlled substance and detained.

---

[2] Initially, the officers were not aware that Higgins was a deputy sheriff with the Shelby County Sheriff's Department. At some point during the buy-bust operation, petitioner informed them of this fact.

[3] During his cross examination testimony before the Merit Board, Higgins stated that he visited the rooming house for the additional purpose of loaning Brenda Cook money. Higgins testified that he had met Cook on a few other occasions. Higgins further acknowledged that he only had "some change" on his person when he arrived at the rooming house, and could not remember exactly how much money he had agreed to loan Cook.

[4] The parties dispute whether Higgins exhibited signs of intoxication. Officer Renwick Cowins ("Officer Cowins") testified that Higgins appeared to be intoxicated, "more on drugs" than alcohol. Higgins insists that he exhibited no signs of intoxication, and cites to the testimony of Officer Taylor, who admitted that he could not "sense that [petitioner] was intoxicated."

Later that evening, Higgins was released on his own recognizance. Shortly after petitioner's release, Inspector Tucker and Captain Hughes of the Internal Affairs Division approached Higgins and ordered a "drug test from him, a drug screen urinalysis according to policy 5-1992[5] of Shelby County Sheriff's Office." Two representatives from the Deputy Sheriff's Association were present on behalf of petitioner Higgins when the direct order was given. No lawyer was present on Higgins behalf at the time of the order.[6]

Higgins refused Inspector Tucker's order to submit to a drug test, and now asserts that his primary reason for doing so was a need and desire to speak with counsel so that the charges against him might be explained or clarified. The next day, February 26, 1997, Inspector Tucker asked Higgins to return for a second meeting at the Internal Affairs office. During this meeting, Tucker clarified that the request of February 25 was a direct order to submit to an immediate drug test. After Higgins acknowledged that he understood the February 25 "request" to be an order, petitioner was ordered to submit to a urinalysis exam for a second time. Higgins again refused. According to Inspector Tucker, Higgins confirmed that he understood that his refusal to take the test would constitute insubordination.

In the evening hours of February 26, Higgins contacted his attorney, W. Otis Higgs ("Higgs"). On February 27, 1997, after conferring with his attorney, Higgins voluntarily returned

---

[5] In pertinent part, policy 5-1992 provides:

> Whenever there shall be reasonable suspicion or probable cause of any employee of the Shelby County Sheriff's Department as using or under the influence of any controlled substance other than alcohol, it shall be the policy of Shelby County Sheriff's Department to request that such employee voluntarily submit to a urinalysis drug screen test. Should the employee refuse to submit to such a test after being ordered to do so he or she shall be charged with insubordination, relieved of duty with pay and given notice of a date and time of administrative hearing on the insubordination charge.

[6] Article VI (7), *Internal Investigation Procedures*, of the *Memorandum of Understanding* between Shelby County Sheriff's Department and the Shelby County Deputy Sheriff's Association, I.U.P.A. Local 58, A.F.L.-C.I.O., provides:

> In all cases where an employee is to be interrogated concerning an alleged violation which, if proven, may result in his criminal prosecution, he shall be afforded a reasonable opportunity and facilities to contact and consult privately with an *Association representative and/or an attorney of the employee's choice*, either of whom may be present during the interrogation.

(emphasis added).

Despite this provision, Inspector Tucker testified that it was not the policy and practice of the Association or the Sheriff's Department to have an attorney present on behalf of the employee during the time in which drug screenings are offered to the accused officer.

to the Internal Affairs office and requested a drug test. Higgins' request was denied on the basis that he "had passed up his opportunity and would not be given a test through the Department."

After Higgins' request to submit to urinalysis was denied, the case was assigned to Sergeant Cash of Internal Affairs. Inspector Tucker testified that Sergeant Cash completed the investigation by taking statements from Higgins and the officers involved in petitioner's arrest. Based on this investigation, the following charges were levied against Higgins: (1) insubordination; (2) conduct unbecoming an officer; and (3) possession and use of illegal drugs.

Within a week of the incident and Internal Affairs' completion of the investigation, Deputy Chief Don Wright ("Chief Wright") conducted a Loudermill Hearing to address and evaluate the three charges assessed against Higgins. After examining the investigation report from Internal Affairs, the statements of officers Polk, Taylor, and Cowins, the police reports filed in this case, and hearing testimony from petitioner Higgins, Chief Wright ordered the termination of Higgins' employment. Chief Wright later testified at the Civil Service Merit Board hearing that all three charges independently supported a decision of termination.

Higgins appealed his termination to the Shelby County Civil Service Merit Board ("Merit Board"), and a hearing was held before this board on June 19, 1997. On July 7, 1997, the Merit Board entered a published decision sustaining Higgins' termination, and finding petitioner guilty "[w]ith regard to the charges."[7] The Merit Board further noted that "[i]t is the opinion of the Board that the Petitioner was completely aware of the nature, activities, and character of the people that frequented this particular rooming house."

On September 5, 1997, Higgins filed a Petition for Writ of Certiorari in chancery court.[8] Additionally, Higgins petitioned the court for grant of a statutory appeal of the Merit Board's decision to sustain termination, "for the purpose of reviewing the legality of his discharge...." Higgins relied on the following allegations in support of his petition:

> Sheriff's Department supervisors demanded that Deputy Higgins take a drug test. Deputy Higgins refused to take the test because there was no reasonable suspicion to justify the test, the Sheriff's Department demand appeared to be a criminal investigation, and because a deputy sheriff has a right to seek advice of counsel

---

[7] The Merit Board's decision states: "With regard to the charges, the Board finds the Petitioner guilty." All three charges, insubordination, conduct unbecoming an officer, and possession and use of illegal drugs, are set forth immediately above the aforementioned statement. Although the decision does not specifically provide a statement of guilt for each individual charge, the general language and format of the opinion makes evident the fact that the Merit Board found Higgins guilty of all three charges.

[8] A motion to dismiss the cause for lack of prosecution was filed and subsequently granted by the chancery court in an Order entered June 2, 2000. On August 7, 2000, petitioner filed a Motion to Set Aside Dismissal. The chancery court granted the motion and reinstated the matter for trial.

under the Memorandum of Understanding between the Sheriff and the Deputy Sheriff's Association. After obtaining counsel he offered to take the test, at a time when meaningful results could have been obtained; but the Sheriff's Department refused to let him.

Deputy Higgins was charged by the Sheriff's Department with insubordination, conduct unbecoming an officer, and possession and use of drugs. He was terminated by the Sheriff's Department.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The decision of the Shelby County Civil Service Merit Board of July 7, 1997 is not supported by the evidence, is arbitrary and capricious, and is contrary to law.

The finding of the Board ... is that Deputy Higgins "was aware of the nature, activities, and character of the people that frequented this particular rooming house." This finding is not supported by evidence in the record. The finding shows that termination was sustained by the board based on unbecoming conduct by presence at the rooming house, and was not based on possession or use of drugs, or the refusal to take a drug test.

In its Final Order entered October 17, 2001, the chancery court held:

This matter came on to be heard upon the Petition of Deputy Michael Higgins as an appeal from a decision of the Shelby County Civil Service Merit Board, and upon having considered statements of counsel, the pleadings filed in this case, and the record as a whole, it is the opinion of this Court that the Civil Service Merit Board did not violate any of Petitioner's rights to due process of law and that the Civil Service Merit Board did not act fraudulently, illegally, or arbitrarily. Furthermore, substantial and material evidence exists in the record to support the decision of the Civil Service Merit Board.

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that:

The decision of the Shelby County Civil Service Merit Board upholding the termination of Petitioner Deputy Michael Higgins from the Shelby County Sheriff's Department is hereby affirmed. Costs are assessed against Petitioner, against whom execution may issue if necessary.

Higgins appeals, presenting the following issues for review, as quoted from his brief:

> 1. Whether the Chancery Court erred in finding that the administrative agency acted legally based on substantial and material evidence in the record.
>
> 2. Whether the appellant deputy was denied his employment right of consultation with counsel under the policy and past practice of the Sheriff's Department.

Upon our review of the record and the briefs submitted, we rephrase the issue as follows: Whether there is material evidence in the record to support the Merit Board's decision to uphold petitioner Higgins' termination.

Under the common law writ of certiorari:

> The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy. This section does not apply to actions governed by the Tennessee Rules of Appellate Procedure.

T.C.A. § 27-8-101 (2000). In *Armstrong v. Tenn. Dep't of Corr.*, No. M2000-02328-COA-R3-CV, 2001 WL 618603, at *1 (Tenn. Ct. App. June 7, 2001), this Court said:

> As the trial court correctly pointed out, the scope of review under a common law writ of certiorari is very narrow. It does not involve an inquiry into the intrinsic correctness of the decision of the tribunal below, but only as to whether that tribunal has exceeded its jurisdiction, or acted illegally, fraudulently or arbitrarily. *See Powell v. Parole Eligibility Review Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994); *Yokley v. State*, 632 S.W.2d 123 (Tenn. Ct. App. 1981). The writ is not available as a matter of right, but is granted under unusual or extraordinary circumstances. *Clark v. Metro Gov't of Nashville*, 827 S.W.2d 312, 316 (Tenn. Ct. App. 1991). Its grant or denial is within the sound discretion of the trial court. *Boyce v. Williams*, 389 S.W.2d 272 (Tenn. 1965).

Judicial review of the decision of a lower board or tribunal under the common law writ of certiorari "may be had only when the trial court finds that the Board has acted in violation of constitutional or statutory provisions or in excess of its own statutory authority; has followed unlawful procedure or been guilty of arbitrary or capricious action; or has acted without material

evidence to support its decision." ***Watts v. Civil Serv. Bd.***, 606 S.W.2d 274, 277 (Tenn. 1980). "On appeal, [an appellate court's] scope of review is the same; it 'is no broader or more comprehensive than that of the trial court with respect to evidence presented before the Board.'" ***Gross v. Gilless***, 26 S.W.3d 488, 492 (Tenn. Ct. App. 1999) (quoting ***Watts v. Civil Serv. Bd.***, 606 S.W.2d 274, 277 (Tenn. 1980), ***cert. denied***, 450 U.S. 983, 101 S. Ct. 1519, 67 L. Ed. 2d 818 (1981)).

If petitioner's argument is interpreted as "nothing more than an attack on the intrinsic correctness of the board's decision and an effort to have the courts reweigh the evidence presented to the board," such argument must fail as a common law writ of certiorari "cannot be used to raise these sorts of issues." ***Robinson v. Clement***, 65 S.W.3d 632, 637 (Tenn. Ct. App. 2001) (citing ***Arnold v. Tennessee Bd. of Paroles***, 956 S.W.2d 478, 480 (Tenn. 1997); ***Powell v. Parole Eligibility Review Bd.***, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994)). Granting petitioner the benefit of the doubt, we proceed with our analysis, and address whether there is material evidence in the record to justify Higgins' termination.

Based on our review of the record, we conclude that the Merit Board's decision to terminate Higgins for insubordination and possession and use of illegal drugs was supported by material evidence.[9] Beginning first with the charge of insubordination, we find material evidence in the record to support termination on the grounds that petitioner, in violation of Department Policy 5-1992, refused two separate direct orders from Internal Affairs to submit to drug testing. In contesting the legality of the insubordination charge, petitioner first alleges that he did not interpret Internal Affairs' February 25 "request" as a direct order to submit to urinalysis. Petitioner's assertion is directly contradicted by his sworn testimony at the June 19, 1997 hearing before the Merit Board, in which he stated:

> Q: And do you recall Inspector Tucker saying then "Did you understand that was a direct order to be drug screened" and you said "Yes, sir"?
>
> A: Yes, sir.
>
> Q: And then he said "You understand that" and you said "Yes, sir" again. Do you recall that?
>
> A: Yes, sir.

Petitioner next argues that his refusal to comply with the February 25 and 26 orders did not constitute insubordination as Article VI (7) of the Memorandum of Understanding provides an employee accused of using illegal drugs with the right to delay testing until he has had an opportunity to confer with a lawyer. Pursuant to Article VI (7), an employee "shall be afforded a ***reasonable***

---

[9] We note that Higgins did not appeal the legality of the Merit Board's decision to uphold petitioner's termination on the grounds of conduct unbecoming an officer.

*opportunity* and facilities to contact and consult with an ***Association representative and/or an attorney of the employee's choice***," when said employee is being interrogated for a violation that may result in criminal prosecution. (emphasis added). Higgins asserts that despite his efforts, he was unable to contact attorney Higgs until late on the evening of February 26. Petitioner further insists that he immediately approached Inspector Tucker on February 27, after consulting with Higgs, and volunteered to submit to urinalysis.

We are unpersuaded by Higgins' argument that he was unjustly terminated for insubordination, where his refusal to submit to testing was validated by the fact that he had not yet had the opportunity to confer with counsel. Although Higgins did not have the presence or assistance of counsel at the February 25 and 26 interviews, the evidence is undisputed that two Association representatives were present at each interview. Article VI (7) provides accused employees with a right to contact and consult with an Association representative and/or an attorney of the employee's choosing. The incorporation of the term and/or leads this court to conclude that the presence of counsel is not necessarily required at an interrogation where the accused employee is provided with the assistance of his Association representatives. This conclusion is further buttressed by Inspector Tucker's testimony that it is not the policy or practice of the Association or the Sheriff's Department to have an attorney present on behalf of the employee during the time in which drug screenings are offered to the accused officer.

Moreover, despite Higgins' claim that he was not afforded a reasonable opportunity to contact and consult with an attorney, there is no evidence in the record to indicate that petitioner, or the Association representatives acting on his behalf, explicitly requested the presence or assistance of counsel at either of the February interviews. This fact is made evident by the following passage from petitioner's cross examination testimony before the Merit Board:

> Q: Okay. I'll just ask it this way. Is it your testimony here today that at the interview with Inspector Tucker that you told him the reason I'm turning this down is I want to consult with an attorney before I take a test?
>
> A: I don't know if I told him or not because I was talking – I had my Union representation with me, but I know that I was telling them that. I don't know if I just – you know, face to face with Inspector Tucker did it myself, you know, without lying or perjuring myself, but that's what I wanted, you know, that's what I wanted. I wanted some of these [charges] cleared up, Counselor.
>
> Q: Did you hear your Union representative tell Inspector Tucker that before we do anything else Mr. Higgins wants to talk to his lawyer about this?
>
> A: I don't recall, Counselor.

-8-

Q: All right. Well, if it was so, if that was one of your primary concerns why didn't you make sure that was understood?

A: Oh, I did. I did through my Union representation.

Although Higgins testified that he advised his Association representatives of his desire to have assistance of counsel, there is no evidence in the record to suggest that the representatives relayed Higgins' request for an attorney to Inspector Tucker. Having failed to explicitly notify Internal Affairs of his need or desire for assistance of counsel, Higgins cannot now successfully challenge his termination for insubordinate behavior on the grounds that he was entitled to refuse testing under Article VI (7) until given the opportunity to confer with an attorney.

We take further issue with petitioner's transparent effort to manipulate the "reasonable opportunity" standard espoused in Article VI (7). Higgins maintains that despite his reasonable efforts, he was unable to contact attorney Higgs until the evening of February 26. Higgins further notes that upon conferring with Higgs, he immediately approached Inspector Tucker on February 27 to request a drug test.

Under the circumstances of this case, we find that three days was an unreasonable amount of time to delay the ordered drug test. Higgins had a reasonable amount of time, between the first order of February 25 and the second order of February 26, to contact and confer with counsel. Assuming as true Higgins' statement that he was unable to get in touch with attorney Higgs, we find no reason that petitioner could not have contacted and retained equally qualified representation. In fact, during his testimony, Higgins stated that he directed his Association representatives to contact Higgs or attorney Alan Chambers, petitioner's counsel in the case at bar. However, there is no evidence in the record to suggest that Higgins attempted to contact attorney Chambers on his own accord.

More importantly, if this court were to adopt petitioner's interpretation of the department's policy, the drug testing procedures and safeguards available to the department would no longer have any utility, as employees suspected of intoxication could delay testing for weeks on end under the ruse that their attorney of choice was unavailable for consultation or out of the country on business. Prompt testing is necessary where an employee has been accused of being under the influence of illegal narcotics and, therefore, despite the rather vague language of Article VI (7), a cut-off point must be established to prevent accused employees from engaging in unreasonable delay that could hinder the accuracy and utility of the approved testing measures.

For these reasons, we find that there is material evidence in the record to support the Merit Board's decision to uphold petitioner's termination on insubordination grounds.

Higgins next asserts that there is no material evidence in the record to support the "underlying drug offense" upon which termination was partially based and subsequently upheld. Specifically, Higgins argues: (1) conflicting evidence exists as to whether petitioner had actual

physical possession of the glass straightshooter pipe; (2) "there is no proof in the record that the rocks on the coffee table were cocaine;" and (3) there is conflicting evidence in the record as to whether Higgins admitted, at the scene, to smoking a rock of cocaine.

The three arguments asserted above essentially boil down to a question of credibility. In rendering its decision to affirm petitioner's termination, the Merit Board was forced to assess and weigh the credibility of the testifying parties. When the resolution of the issues in a case depends upon the truthfulness of a witness, the trial judge or trier of fact, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Sp. Workers Comp. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 19997) The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*. *See also In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

With regard to petitioner's first argument, whether petitioner had actual physical possession of the pipe, the Merit Board noted the following factual findings in its Published Order:

> Officer Polk testified that while he was in the hallway with the subjects, a door to one of the rooms opened. Officer Polk stated he looked into the room and saw the Petitioner sitting in a chair with a glass shooter crack pipe in his hand.
>
> Officer Polk testified that when the Petitioner realized that he was a policeman, he dropped the crack pipe on the floor.
>
> Officer Cowins testified that he did not actually see the crack pipe in the Petitioner's hand because he was in the hallway most of the time with the other subjects.
>
> Officer Taylor testified that he did not see the crack pipe in the Petitioner's hands. Officer Taylor explained that a crack pipe was recovered from the floor close to Petitioner's feet.
>
> The Petitioner testified that he never noticed the crack cocaine on the table nor did he have a crack pipe in his hand.

In finding Higgins guilty of possession and use of drugs, the Merit Board apparently attributed greater weight, faith, and credit to the testimony of Officers Polk and Taylor, than that of petitioner. Considering the record as a whole, and giving proper deference to the weight, credit, and faith awarded the above cited evidence by the Merit Board, we find that the testimony of the officers regarding petitioner's physical possession of the pipe is material evidence to support the board's decision to terminate Higgins for possession and use of drugs.

-10-

Petitioner's second argument is equally without merit. Higgins contends that there is no evidence in the record to prove that the substance(s) found on the coffee table was rock cocaine. The Merit Board entered the following findings of fact concerning the nature of the substance(s) found on the coffee table directly in front of Higgins:

> Officer Polk explained that he and another officer noticed a substance on a coffee table that appeared to be crack cocaine. Officer Polk stated that the coffee table was right in front of Petitioner.

> Officer Polk testified that the substance was taken to the lab and tested positive for crack cocaine.

> Officer Cowins stated that he did notice the substance that appeared to be crack cocaine on the coffee table.

> Officer Taylor testified that he did not notice a substance that appeared to be crack cocaine on the coffee table. Officer Taylor stated that he was present in the lab when the substance was tested and it was determined that it was crack cocaine.

> The Petitioner testified that he never noticed the crack cocaine on the table nor did he have a crack pipe in his hand.

In weighing this evidence, the Merit Board was apparently persuaded by the testimony of the three officers that the substance(s) on the coffee table was, in fact, crack cocaine. Considering the record as a whole, and giving proper deference to the weight, credit, and faith awarded the above cited evidence by the Merit Board, we find that the testimony of the officers regarding the nature of the crack cocaine found on the coffee table is material evidence to support the board's decision to terminate Higgins for possession and use of drugs.

Petitioner's final argument contesting the legality of his termination for smoking crack cocaine. We quote the following factual findings of the Merit Board in regard to this argument:

> Officer Polk testified that the Petitioner stated he had just finished smoking a rock (crack cocaine) and he was not involved in what happened outside the room.

> Officer Taylor testified that he heard the Petitioner state that he had just finished smoking a rock.

Higgins maintains that he never made any statement to the effect that Officers Polk and Taylor testified. Regardless of petitioner's insistence that he never admitted to smoking rock cocaine, the Merit Board apparently awarded a significant amount of weight, faith, and credit to the statements

of the testifying officers.  Considering the record as a whole, and giving proper deference to the weight, credit, and faith awarded the above cited evidence by the Merit Board, we find that there is material evidence in the record to support the board's decision to terminate Higgins for possession and use of drugs.

In conclusion, we find that there is material evidence in the record to support the Shelby County Civil Service Merit Board's decision upholding petitioner Michael Higgins termination on the grounds of insubordination and possession and use of illegal drugs.  Accordingly, the Order of the chancery court is affirmed.  Costs of appeal are assessed against petitioner Michael Higgins and his surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.